## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In the Matter of: | ) | Chapter 7 |
| | ) | |
| Nancy Goldfeder, | ) | Case No. 17-12873 (LSS) |
| | ) | |
| Debtor. | ) | Re: Docket Nos. 21, 27, 52, 62, 70, 72, 73 |

## OPINION

Before me is the Objection to Debtor's Claim of Exemption Filed by Deutsche Bank National Trust Company as Trustee[1] ("Objection")[2] by which Deutsche Bank objects to Debtor's homestead exemption. While there have been multiple discovery disputes, the issue before me boils down to the following question: whether, on December 7, 2017—the day Ms. Goldfeder filed her bankruptcy petition—the real property Ms. Goldfeder seeks to exempt was her principle residence.[3] Because Deutsche Bank has the burden of proof and it has not shown that Ms. Goldfeder improperly claimed her homestead exemption, I will overrule the Objection.

**The Law on Exemptions**

Exemptions exist to protect "property essential to life and livelihood" from the collection efforts of creditors.[4] Exemptions are provided by nearly every state and by the

---

[1] Deutsche Bank National Trust Company as Trustee for Morgan Stanley, ABS Capital 1 Inc., Trust 2005-HE2 ("Deutsche Bank").

[2] Obj. to Debtor's Claim to Exemption Filed by Deutsche Bank National Trust Company as Trustee, D.I. 21.

[3] Reply Br. of Creditor in Further Supp. of Debtor's Claimed Exemption ("Reply Brief") 2, D.I. 73.

[4] *See* 3 William L. Norton III, Norton Bankruptcy Law & Practice § 56.1 (3d ed. 2019); *Law v. Siegel*, 571 U.S. 415, 427 (2014) (quoting *Schwab V. Reilly*, 560 U.S. 770, 791 (2010) ("[I]n crafting the provisions of § 522 'Congress balanced the difficult choices that exemption limits impose on debtors with the economic harm that exemptions visit on creditors.'")).

United States Congress (through the Bankruptcy Code) to protect debtors from "destitution and, as a consequence, dependence upon the public fisc."[5] Together with the discharge, exemptions provide the principal way in which a debtor receives her fresh start in bankruptcy. Because of that, exemption provisions are liberally construed.[6]

Delaware has opted out of the federal exemptions.[7] So, as here, debtors seeking to take advantage of exemptions look to Delaware law. As relevant, Delaware law provides:

> In any federal bankruptcy or state insolvency proceeding, an individual debtor and/or such individual's spouse domiciled in Delaware shall be authorized to exempt from the bankruptcy or insolvency estate, in addition to the exemptions made in subsection (b) of this section and in § 4915 of this title, the following:
>
> (1) Equity in real property or equity in a manufactured home (as defined in Chapter 70 of Title 25) which constitutes a debtor's *principal residence* in an aggregate amount not to exceed $75,000 in 2010, $100,000 in 2011, and $125,000 thereafter, except that the exemption for persons totally disabled from working or married persons where at least 1 of the spouses is 65 years old or older shall be $125,000 effective immediately.[8]

The term "principal residence" is not defined in the statute, and neither party has cited case law defining the term or setting forth the factors a court uses to determine a debtor's principal residence in this context.[9] Debtor cited two Delaware cases in the divorce context that examine domicile for jurisdictional purposes.[10] Deutsch Bank does not cite any Delaware case law.

---

[5] Norton, *supra* note 4, at § 56.1; *see also In re Krebs*, 527 F.3d 82, 85 (3d Cir. 2008) ("The historical purpose of exemption laws has been to protect a debtor from [her] creditors, to provide [her] with the basic necessities of life so that even if [her] creditors levy on all of [her] nonexempt property, the debtor will not be left destitute and a public charge.").

[6] Norton, *supra* note 4, at § 56.1.

[7] Del. C. Ann. tit. 10 § 4914(a).

[8] Del. C. Ann. tit. 10 § 4914(c)(1).

[9] Our independent research did not reveal any reported cases.

[10] Debtor's Resp. to Deutsche Bank's Letter Br. in Supp. of the Obj. to the Homestead Exemption ("Answering Brief") 9–10, D.I. 72 (citing *Long v. State*, 44 Del. 262 (1949) (discussing jury instructions given by the lower court regarding defendant's intent to make Arkansas his home) and *In re Marriage of Pascavage v. Pascavage*, 1994 WL 837452, at *9–10 (Del. Fam. Ct. July 1, 1994), *aff'd*

In *Boyer v. Sylvester*, a recent decision of the Delaware Court of Common Pleas, the Court explored the term "principal residence" for purposes of Delaware's Landlord Tenant Code.[11] Recognizing, as here, that the term is not defined in the statute, the *Boyer* Court found instructive cases defining the term "domicile." Citing to previous Delaware cases,[12] the *Boyer* Court variously defined principal residence as: (i) "the combination of a temporary or permanent presence on the property, with the intent to make the property's one home[sic];" (2) "the act or fact of abiding or dwelling in a place for some time; an act of making one's home in a place;" (3) "a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from a place or temporary sojourn or transient visit;" (4) "reside, despite the fact that it is somewhat formal, may be the preferred term for expressing the idea that a person keeps or returns to a particular dwelling place as his fixed, settled or legal abode;" and (5) "domicile is defined as a dwelling place with the intention to make that place the resident's permanent home. It requires a concurrence of the fact of living at a particular place with the necessary intention of making that the permanent home." Applying that standard to the facts before it, the *Boyer* Court found the property at issue to be defendant's principal residence where, among other things, (i) defendant was the owner of record, paid the bills (e.g. utilities, mortgage) and those bills were in her name, (ii) prior to her one year absence from the home she had lived there for fifty years, her absence was due to her husband's death and her desire to live with her

---

*sub nom. Pascavage v. Aperio*, 655 A.2d 1225 (Del. 1995) (ruling that "actual reside[ncy] satisfying the jurisdictional requirements of 13 Del.C. § 1504 has been defined to mean domicile;" but recognizing residence and domicile are not equivalent. Further stating "it is well settled that the essential components of a domicile are (1) the fact of physical presence and (2) the intent to permanently make that place home.")).

[11] *Boyer v. Sylvester*, 2011 WL 2671872 at *6-7 (Del. Com. Pl. July 1, 2011).

[12] *Williamson v. Standard Fire Ins. Co.*, 2005 WL 6318348 (Del. Super. Ct. Aug. 19, 2005); *Fritz v. Fritz*, 187 A.2d 348 (Del. 1962).

daughter in another state for a period of one year, (iii) the residence was rented during that one year period and (iv) defendant intended the property to be her permanent home.

The *Boyer* Court's description of principal residence and its analytical approach is consistent with case law cited by Debtor interpreting the homestead exemption under either non-Delaware state law or the Bankruptcy Code. Courts look at the totality of the circumstances with respect to where debtor is residing and debtor's intent.[13]

**Burden of Proof**

A debtor must list the property she claims as exempt on her schedules.[14] Unless a party in interest objects, all property on the list is exempt.[15] If an objection is filed, the objecting party has the burden of proof to show that the exemption is not properly claimed.[16]

In its Reply Brief, Deutsche Bank cites to *In re Scioli*[17] for the proposition that once an objecting party produces evidence, the burden shifts to the debtor to come forward with "unequivocal" evidence to show the exemption is proper.[18] From this, Deutsche Bank suggests (without actually stating) that (i) the debtor (not the objector) has the ultimate burden of proof/persuasion at a claim exemption hearing and (ii) once an objecting party produces some evidence to support its position that the exemption is not properly claimed, a

---

[13] Answering Brief 10–13.
[14] 11 U.S.C. §522(l) ("The debtor shall file a list of property that the debtor claims as exempt under subjection (b) of this section. . . . Unless a party in interest objects, the property claimed as exempt on such list is exempt.").
[15] *Id.*
[16] Fed. R. Bankr. P. 4003(c).
[17] 2013 WL 318718, at *1 (Bankr. D. Del. Jan. 28, 2013), *subsequently aff'd,* 586 F. App'x 615 (3d Cir. 2014).
[18] Debtor did not have an opportunity to respond to this argument as it was raised in the Reply Brief.

debtor must meet some heightened standard of evidence in response. These inferences are not consistent with Bankruptcy Rule 4003.

Bankruptcy Rule 4003 places the burden of persuasion in claim exemption disputes squarely on the objecting party. The rule provides: "In any hearing under this rule, the objecting party has the burden of proving that the exemptions are not properly claimed."[19] Neither § 522(l) nor Bankruptcy Rule 4003 requires a debtor to provide "unequivocal evidence" that it is entitled to the exemption. Further, there is an inherent inconsistency between Rule 4003's mandate that the objector has the burden of proof and the *Scioli* court's recitation that a debtor provide "unequivocal evidence" to show her exemption is properly taken. While the "unequivocal evidence" standard is nowhere defined, as the common usage of the term "unequivocal" means "unambiguous; clear; free from uncertainty,"[20] such a standard would appear to be greater than "preponderance of the evidence" or even "clear and convincing evidence." As a practical matter, an "unequivocal evidence" standard would certainly shift the ultimate burden of proof from the objector to the debtor.

*In re Scioli* recited, but did not analyze, the burdens of production and persuasion in the context of a claimed exemption of personal property. The totality of the discussion (without citations) is:

> Bankruptcy Rule 4003(c) provides: "In any hearing [on an objection to a claim of exemptions], the objecting party has the burden of proving that the exemptions are not properly claimed." "Such burden may be met by a preponderance of the evidence." Courts have uniformly held that Rule 4003(c) operates under a "burden shifting" framework. "'A claimed exemption is presumptively valid . . . If the objecting party can produce evidence to rebut the exemption, the burden of production then shifts to the

---

[19] Fed. R. Bankr. P. 4003(c).
[20] Black's Law Dictionary 1760 (10th ed. 2014); *see also Unequivocal,* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/unequivocal (last visited Aug. 17, 2020) (defining unequivocal as "leaving no doubt; clear, unambiguous").

debtor to come forward with unequivocal evidence to demonstrate that the exemption is proper.'"[21]

For the proposition that a debtor must come forward with "unequivocal evidence," the Scioli court cites In re Kicenuik[22] citing to the Ninth Circuit's decision in In re Carter.[23]

In Carter, the Ninth Circuit states (again, without analysis) that: (i) a claimed exemption is presumptively valid; and (ii) the objecting party has the burden to prove that the exemption is not properly claimed. While recognizing that the burden of persuasion always remains with the objecting party, the Ninth Circuit also states that "If the objecting

---

[21] Scioli, 2013 WL 318718, at *2 (citations omitted).

[22] In re Kicenuik, 2012 WL 4506597, at *3 (Bankr. D. N. J. Sep. 28, 2012) (citing Carter v. Anderson (In re Carter), 182 F.3d 1027, 1029 n.3 (9th Cir. 1999)).

[23] 182 F.3d at 1029 n.3. Scioli was affirmed by the Third Circuit in a non-precedential opinion. In re Scioli, 586 Fed.App'x. 615, 617 (3d Cir. 2014). The Third Circuit also recites, but does not analyze, the burden of proof/persuasion also relying on In re Carter. Id. at 617 ("A claimed exemption is 'presumptively valid' . . . Once an exemption has been claimed, it is the objecting party's burden (the trustee in this case) to prove that the exemption is not properly claimed. Initially, this means that the objecting party has the burden of production and the burden of persuasion. The objecting party must produce evidence to rebut the presumptively valid exemption. *If the objecting party can produce evidence to rebut the exemption, the burden of production then shifts to the debtor to come forward with unequivocal evidence to demonstrate that the exemption is proper.* The burden of persuasion, however, always remains with the objecting party.") (internal citations omitted) (emphasis in original).

Bankruptcy Rule 4003(c) does not appear to imply burden shifting with respect to production of evidence. The Third Circuit does recognize that concept in the context of proof of claim litigation. See In re Allegheny Intern., Inc., 954 F.2d 167, 173-74 (3d Cir. 1992) ("The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid. In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim.") (internal citation omitted); see also Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."). There is a key distinction, however, between claims litigation and exemption litigation. In claims litigation, the party asserting the claim retains the ultimate burden of persuasion. In exemption litigation, the objector—not the debtor asserting/claiming the exemption—bears the ultimate burden of persuasion. I need not decide here whether there is a burden shifting framework in exemption litigation because even if there is, Debtor has put forth sufficient evidence to meet any burden of production she may have. See *infra* Part III.

party can produce evidence to rebut the exemption, the burden of production then shifts to the debtor to come forward with *unequivocal evidence* to demonstrate that the exemption is proper."[24]  The Ninth Circuit borrowed this standard from *In re Moneer*, a bankruptcy court decision from the Northern District of Illinois interpreting Illinois state law on exemptions.[25]

At issue in *Moneer* was whether the debtor had lost his homestead exemption by abandonment. Examining Illinois law, the *Moneer* Court determined that the question of abandonment was largely a matter of intention, which could be shown by words or deeds. The *Moneer* Court quoted Illinois decisional law for two principles: (i) "[s]uch intention to return [to the homestead] must be unequivocal—equivocal intention to return is not sufficient" and (ii) "[w]hen no new homestead has been acquired, absence from the old one, unless for an extended period of time, does not create a presumption of abandonment."[26]

---

[24] The footnote, in its entirety, reads:

> We note that there was sustained discussion and some disagreement in the bankruptcy court and the BAP concerning burdens of proof, production and persuasion. The burdens of production and persuasion were properly set forth by the BAP. A claimed exemption is "presumptively valid." 9 Collier on Bankruptcy, ¶ 4003.04 (15th ed. rev.1998); *In re Patterson*, 128 B.R. 737, 740 (Bankr. W.D. Tex. 1991). Carter claimed $39,000 as an exemption under C.C.P. § 704.070, and this claim is presumptively valid. Once an exemption has been claimed, it is the objecting party's burden (the trustee in this case) to prove that the exemption is not properly claimed. *See* Fed. R. Bankr. P. 4003(c). Initially, this means that the objecting party has the burden of production and the burden of persuasion. The objecting party must produce evidence to rebut the presumptively valid exemption. *In re Lester*, 141 B.R. 157, 161 (S.D. Ohio 1991). If the objecting party can produce evidence to rebut the exemption, the burden of production then shifts to the debtor to come forward with unequivocal evidence to demonstrate that the exemption is proper. *See In re Moneer*, 188 B.R. 25, 28 (Bankr. N. D. Ill. 1995); Fed. R. Evid. 301. The burden of persuasion, however, always remains with the objecting party. There was no real dispute in the bankruptcy court or the BAP concerning these burdens in the abstract. Rather, the parties disputed the relationship between a subchapter S corporation and a shareholder/employee under C.C.P. § 706.011, which was reflected in the disagreement about burdens of proof, production, and persuasion.

*Carter*, 182 F.3d at 1029 n.3.

[25] *In re Moneer*, 188 B.R. 25 (Bankr. N.D. Ill. 1995).

[26] *Id.* at 27 (citing *Rasmussen v. Rasmussen*, 13 N.E.2d 166, 168 (Ill. 1938)).

The *Moneer* Court then applied Federal Rules of Evidence 301[27] and 302[28] made applicable

by Federal Rule of Bankruptcy Procedure 9017 to the exemption hearing.  Apparently

concluding there is a substantive presumption in the Illinois homestead law with respect to

abandonment that runs against the party claiming the exemption, the *Moneer* Court

concluded that "although the [objector] has the burden of proof as mandated by Bankruptcy

Rule 4003(c), under [Illinois state law] and Federal Rule of Evidence 301, the Debtor has

the burden of coming forward with unequivocal evidence to rebut the presumption that

when he left his spouse and immediate family and removed himself from the Property, he

left without any intention of returning and thereby abandoned his estate of homestead in the

Property."[29]

        At most, *Moneer* stands for the proposition that bankruptcy courts applying Illinois

homestead exemption law in a scenario where abandonment is at issue require a debtor to

come forward with "unequivocal evidence" that he did not mean to abandon the

homestead.  I respectfully disagree with courts that have adopted the *Moneer* standard

---

[27] Federal Rule of Evidence 301 provides that "In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption.  But this rule does not shift the burden of persuasion, which remains on the party who had it originally." Fed. R. Evid. 301.

[28] Federal Rule of Evidence 302 provides that "In a civil case, state law governs the effect of a presumption regarding a claim or defense of which state law supplies the rule of decision." Fed. R. Evid. 302. Rule 302 embodies the *Erie* doctrine such that if state law provides a true presumption and as such is a substantial element of the claim or defense, a federal court must apply that state law in civil actions. 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, §§ 302.02[1], [2][a] (Mark S. Brodin, ed., Matthew Bender 2d ed. 1997).

[29] *Moneer*, 188 B.R. at 28. The *Moneer* Court appears to have broadened the substantive requirement to show an *unequivocal intention to return to the property* into *"unequivocal evidence."*

wholesale in different exemption contexts, interpreting federal exemptions or interpreting state exemptions for states other than Illinois.[30]

Delaware law governs the matter before me.  Assuming, without deciding, that the *Moneer* analysis is the correct approach generally with respect to the burdens on parties in exemption disputes under the Bankruptcy Code, Deutsche Bank cites no Delaware state law creating a presumption running against Debtor under 10 Del. C. § 4914, the relevant statute. Therefore, Debtor is not required to provide "unequivocal evidence" that she is entitled to her claimed exemption.  Rather, as stated in Rule 4003, Deutsche Bank has the burden of proof.  As no party has cited a standard greater than "preponderance of the evidence," that is the standard Deutsche Bank must meet.

One court has observed: "placing the burden of proof on the objector presents a formidable task since most of the information regarding the exempt asset will be held by the debtor or some other third party, not the objector."[31]  But this standard reflects Congress' goals in providing exemptions: namely, to permit debtors a fresh start with a minimal safety net and to reduce dependence on the public fisc.  It is against this backdrop that I approach the matter before me.

**Procedural Posture**

On December 7, 2017 ("Petition Date"), Nancy Goldfeder ("Debtor") filed a voluntary bankruptcy petition[32] ("Petition") under chapter 7 of the United States Bankruptcy Code ("Code").  At each place on the Petition requiring a signature, the Petition

---

[30] *C.f. In re Pomeroy*, 2016 WL 3564378, at *15 (Bankr. E.D. Cal. June 21, 2016) (finding Carter to be *dicta* and concluding that there is no sufficient basis to hold a debtor to an unequivocal evidence standard on an objection to an exemption).

[31] *Kieceniuk*, 2012 WL 4506597, at *3.

[32] D.I. 1.

was signed by both Debtor and Dr. Emil Mikhail who signed as "Guardian Ad Litem (Superior Court Order)." Thereafter, on December 11, 2017, Debtor filed a motion to appoint Mikhail as her guardian *ad litem* for purposes of the bankruptcy case.[33] In that motion, Debtor represented that Mikhail had been appointed Debtor's guardian *ad litem* by order of the Superior Court dated July 26, 2012 because of Debtor's debilitating physical and mental illnesses, which were not anticipated to improve. No objections were filed to Debtor's request and an Order appointing Mikhail as Debtor's guardian *ad litem* was entered on January 19, 2018.[34] Debtor received her discharge on April 10, 2018.[35]

The only controversy in the bankruptcy case has been with Deutsche Bank over Debtor's claimed exemption. On Schedule A filed with the Petition, Debtor lists a property at 1610 North Union Street, Wilmington, Delaware 19806 as a single-family home with a current value of $100,000 ("Union Street Property").[36] Debtor also schedules "3 Rooms Used Household Goods" valued at $1,500. On Schedule C, Debtor claims her Delaware exemptions, including "100% of the fair market value, up to any applicable statutory limit" for the Union Street Property pursuant to 10 Del C. § 4914(c)(1).

On February 9, 2018, Deutsche Bank filed the Objection. Deutsche Bank does not take issue with Debtor's valuation of the Union Street Property. Nor does Deutsche Bank dispute ownership of the Union Street Property. Rather, Deutsche Bank contends that the

---

[33] Mot. to Appoint the Guardian *ad litem* Nunc Pro Tunc to the Order for Relief, for the Appearance at the 341 Meeting of Creditors, and to Assist the Trustee in Debtor's Stead Throughout the Bankruptcy Case, D.I. 13.

[34] Order Appointing and Granting to The Guardian *ad litem*, Nunc Pro Tunc, Full Power and Capacity to Assist Debtor and to have Standing as Debtor Throughout the Bankruptcy Case, D.I. 17.

[35] Order of Discharge, D.I. 37.

[36] Debtor also notes: "Property was improperly sold to Brian O'Neal in October 2015 for $130,000.00 but sale was not consummated. Damage resulted in No running water, sewer repairs necessary and gas heat repairs. Est. As is cost of $100K at most." Petition 11.

Union Street Property is not Debtor's principal residence and that she has not lived at the Union Street Property for "at least approximately ten (10) years, if not longer."

After the filing of the Objection, the parties began discovery. Deutsche Bank diligently pursued both written discovery and deposition testimony. It sent document requests and noticed Mikhail's deposition.

On October 17, 2018, a Joint Stipulated Pretrial Scheduling Order was entered setting the Objection for trial on January 2, 2019.[37] The Pretrial Order also set a deadline for completion of discovery and depositions of trial witnesses, specifically including the deposition of Mikhail. It further contemplated that the parties might determine to resolve the matter on the papers, rather than a trial. On November 30, 2018, the parties submitted a joint status letter informing the court that the parties would indeed take that route.[38] On December 7, 2018, a further Joint Stipulated Scheduling Order was entered setting forth deadlines for exchanges of final exhibit lists, motions *in limine* and a briefing schedule on the Objection.[39]

Consistent with the agreed to schedule, on February 8, 2019, Deutsche Bank filed a motion *in limine* setting forth specific objections to potential exhibits Debtor might offer in connection with the Objection as follows.[40]

| Exhibit Number | Description | Admissibility Objection |
|---|---|---|
| 2 | "Photographs of the home – 1610 N. Union Street, Wilmington DE 19806" | Authentication/Foundation |
| 3 | "All pleadings filed to date including verified statements and exhibits" | Authentication/Foundation; Hearsay; Relevancy |

---

[37] Joint Stipulated [Proposed] Pretrial Scheduling Order, D.I. 50.
[38] Joint Status Letter, D.I. 53.
[39] Joint Stipulated Scheduling Order, D.I. 55.
[40] Deutsche Bank's Mot. *in Limine* to Preclude Admis. of Debtor's Potential Ex. Nos. 2–7 ("Motion *in Limine*"), D.I. 58.

| 4 | "Sworn testimony taken at 341 meeting of creditors" | Authentication/Foundation; Hearsay; Failure to produce in discovery |
| 5 | "Fidelity National Title Insurance Company title search record" | Authentication/Foundation; Hearsay; Relevancy; Failure to produce in discovery |
| 6 | "Utility Statements and or bank statements as exchanged per Court order" | Authentication/Foundation; Hearsay |
| 7 | "A copy of Debtor's state issued identification card presented to Court and counsel" | Authentication/Foundation |

Debtor responded to the Motion *in Limine*.[41] At a hearing on February 21, 2019, I determined that Deutsche Bank was entitled to a two hour deposition of Mikhail on the issues of authentication and foundation of documents and could be examined on his testimony at the section 341 meeting. I also determined I would consider relevancy objections in connection with the briefing.

On May 6, 2019, Deutsche Bank filed a motion for sanctions[42] based on Mikhail's failure to appear for his deposition. Mikhail asserted that his own health was deteriorating and he was not available to attend a deposition. In the Motion for Sanctions, Deutsche Bank sought an order precluding Debtor from submitting into evidence the documents identified in the Motion *in Limine*. Debtor's response included a motion for a limited re-opening of the discovery period and suggested possible alternative witnesses on the documents.[43] At that hearing, I permitted another 30 days for additional discovery so that

---

[41] Resp. to Creditor, Deutsche Bank's, Mot. in *Limine* to Preclude Admis. of Debtor's Potential Exhibits Nos. 2–7, D.I. 60.
[42] Deutsche Bank's Mot. for Relief from Debtor's Disc. Violations ("Motion for Sanctions"), D.I. 62.
[43] Resp. to Creditor, Deutsche Bank's, Mot. for Relief from Debtor's Disc. Violations and Counter Mot. to Re-Open Limited Disc., D.I. 63. Debtor's response also attached a one page document titled Psychological Functional Capacity signed by Nana Berkiashvili, M.D. stating, among other things, "Pt [Mikhail] suffers from intractable insomnia nightmares and inability to function due to severe fatigue and cognitive issues." *Id.* at 63-1.

either party could obtain further discovery on the authentication of documents to be submitted. I also stated that I would decide all objections to exhibits in the context of the briefing and directed parties to state (or re-state) any evidentiary objections in their respective briefs.

The Opening Brief,[44] Answering Brief and Reply Brief were duly filed. I have reviewed the documents submitted with the briefs, considered the objections to the documentary evidence in Deutsche Bank's Motion *in Limine* as well as its objection to further documents submitted by Debtor with her Answering Brief[45] and the Motion for Sanctions. The matter is ripe for decision.

### *The Parties' Positions*

In the Objection, Deutsche Bank asserts that the Union Street Property is not Debtor's principal residence because she has not lived there for at least ten years. Detusche Bank makes two legal arguments in its Opening Brief. First, Deutsche Bank argues that Debtor is estopped from arguing that the Union Street Property is her principal residence because of positions she took before the Delaware Superior Court and Supreme Court in prepetition foreclosure litigation regarding the Union Street Property. Second, it argues "Debtor has failed to establish through credible evidence that the [Union Street Property] is her principal residence."[46] Deutsche Bank argues that the evidence produced by Debtor is inconsistent, non-credible or contradictory. Further, Deutsche Bank questions Mikhail's

---

[44] Opening Br. of Creditor in Supp. of Obj. to Debtor's Claimed Exemption ("Opening Brief"), D.I. 70.

[45] Reply Brief 3 n.4. Deutsche Bank objects to the Certification of Stacey Mattia attached to Debtor's Answering Brief on the basis of hearsay, lack of authentication, late production, inability to depose declarant and as an improper attempt to inject opinion testimony into the case after the close of the discovery period.

[46] Opening Brief 4.

interest in the Union Street Property.  While making this argument, Deutsche Bank barely

challenges Debtor's intent to live at the Union Street Property.  Rather, the argument is that

she does not live there.[47]

Debtor argues that by any measure the Union Street Property is Debtor's principal

residence as she owns the Union Street Property, was living there on the Petition Date, her

personal belongings were there as of the Petition Date, and while she was absent from the

Union Street Property over the years due to her medical condition, Debtor always intended

---

[47] The word "intent" is not found in the Objection or the Opening Brief.  The word "intent" shows
up in the Reply Brief as follows:

> The only testimonial evidence to support that Debtor **intends** to permanently reside
> at the Property now comes from Debtor herself and Guardian, and such testimony
> lacks credibility due to substantial inconsistencies. For example, Debtor alleges in
> her Schedules that the Property is in complete disrepair, has no running water, and
> sewer and gas heat repairs are necessary such that the as-is cost of the Property has
> likely been reduced to $100,000. (D.I. 72-3; D.I. 72-4; D.I. 72- 5). She also argued as
> much in response to Creditor's Objection and during the 341 hearing. (D.I. 72-7 at 7)
> (stating that Debtor uses "alternative water tanks and sources and showers at her
> Guardian's property nearby, and also freely uses her neighbor's bathroom facilities")
> (D.I. 72-8 at 9:1–2) (the house is "really in deplorable condition"). This is of course
> consistent with the fact that the house was condemned previously, and
> representations to the State Court up to the date of the Petition that the house was in
> disrepair. (D.I. 21, Exs. B, C, E; D.I. 70 at 2–3). However, after Creditor filed its
> Objection, and Debtor was put on notice of the issue regarding her principal
> residence, Debtor then produced pictures that purport to show the house with
> running water, and water bills reflecting water usage throughout the time frame she
> claimed she did not have running water. (D.I. 72-19). Guardian also stated that the
> Property had running water in response to Creditor's interrogatories, only after
> Creditor filed the Objection. (D.I. 48, Ex. B).
> . . .
> Unlike the cases cited by Debtor, this is not a case where Debtor recently purchased
> the Property or was unable to live there due to hurricanes or total incapacity. (D.I. 72
> at 14). She has lived at multiple addresses, and apparently is capable of living by
> herself upon her own admission. Instead, Debtor allegedly has chosen to live at the
> Property when, and if, most convenient to her in connection with her legal pursuits.
> She demonstrated no **intent** to permanently reside at the Property throughout the
> pendency of the State Court Action, which persisted up until the date of the Petition,
> in order to avoid foreclosure. Her post-petition evidence—which Creditor continues
> to assert is inadmissible—simply fails to support that the Property was Debtor's
> principal place of residence on the date she filed the Petition.

Reply Brief 4–6 (emphasis added).

to make the Union Street Property her home. Debtor argues that Deutsche Bank has not sufficiently established that the Union Street Property is not Debtor's principal residence. Finally, Debtor argues that Deutsche Bank should be held in contempt for its overly litigious stance.

*Discussion*

### I.    Debtor is not Estopped from Arguing that the Union Street Property is her Principal Residence

Deutsche Bank's main argument is that Debtor is estopped from arguing that the Union Street Property is her principal residence because of positions taken by her (or on her behalf) in a foreclosure proceeding commenced by Deutsche Bank in the Superior Court of the State of Delaware ("Foreclosure Action") and/or findings made by the judge overseeing that action. In the Foreclosure Action, Deutsche Bank foreclosed on a mortgage encumbering the Union Street Property, which went to a sheriff's sale. Debtor successfully argued that she did not receive notice of the Foreclosure Action because she was not living at the Union Street Property at the time. Indeed, the Superior Court found that at the time of the sheriff's sale, Ms. Goldfeder was living in the basement of the property located at 205 Ayre Street, Newport, Delaware (the "Ayre Street Property"), Mikhail's home. As a result, the trial court vacated the sheriff's sale, returning the parties to their original positions. The Supreme Court ultimately affirmed the trial court's ruling.[48]

Deutsche Bank argues that the position taken by Debtor in the Foreclosure Action— that she did not live at the Union Street Property—is inconsistent with the position taken in her bankruptcy case that the Union Street Property is her principal residence. Deutshe Bank

---

[48] *See Deutsche Bank Nat. Tr. Co. v. Goldfeder*, 2014 WL 644442 (Del. 2014).

cites cases for the proposition that if a party takes inconsistent positions, she may be estopped from later making a contradictory argument.[49] Defendant is correct. Applying that doctrine here, however, does not result in the application of any estoppel theory because Debtor is not taking inconsistent positions.

Because Deutsche Bank's estoppel position is firmly rooted in the Foreclosure Action, a chronology assists in evaluating the estoppel argument. The following chronology is largely gleaned from the Supreme Court's February 14, 2014 Opinion (which contains the most complete timeline):[50]

| Date | Relevant Event |
|------|----------------|
| 2004 | Debtor enters into a mortgage with MERS as nominee for Home Funds Direct. The mortgage is secured by the Union Street Property. |
| 2007 | Debtor defaults on the mortgage. |
| 2008 | Deutsche Bank files an *In Rem Scire Facias Sur* mortgage action.[51] |
| April 13, 2010 | Default judgment entered against Debtor for failure to appear. |
| November, 2011 | Writ of *levari facias* issued and sheriff's sale held. Deutsche Bank is declared the high bidder. |

---

[49] Opening Brief 6–7 (citing, among other authorities, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("This rule, known as judicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)) and 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477 (1981) ("absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.")).

[50] The last four entries are taken from Judge Butler's November 12, 2013 ruling. Opening Brief, Ex. A ("Superior Court Ruling").

[51] Debtor states that the mortgage was rescinded. Response to the Deutsche Bank National Trust Company's Objection to Debtor's Claim of Certain Exemptions Pursuant to Fed. R. Bankr. P. 4003(b) ("Debtor's Initial Response") 6, 8, D.I. 27; Answering Brief 6. It is unclear to me why (or exactly when) this happened, but Deutsche Bank has not contended otherwise. In any event, in 2017, Deutsche Bank was back in the Delaware state courts on a sheriff's sale resulting from a judgment lien.

16

| December 23, 2011 | Sheriff sale is confirmed. |
|---|---|
| January 25, 2012 | Sheriff deeds Union Street Property to Deutsche Bank. |
| January, 2012 | Mikhail becomes aware of the sheriff's sale. |
| July 27, 2012 | Superior Court finds Ms. Goldfeder to be incompetent on matters relating to the sheriff's sale and grants Mikhail guardian *ad litem* status. |
| August 8, 2012 | Ms. Goldfeder (through her guardian *ad litem*) files motion to vacate the sheriff's sale, vacate confirmation of the sale and set aside the sheriff's sale ("Motion to Vacate"). |
| August 23, 2012[52] | Superior Court grants Motion to Vacate. |
| Unknown | Deutsche Bank appeals Order granting Motion to Vacate. |
| May 10, 2013 | Delaware Supreme Court remands case to Superior Court for further findings. |
| September 13, 2013 | Delaware Superior Court holds evidentiary hearing. |
| November 12, 2013 | Delaware Superior Court issues its additional factual finding again concluding that the Motion to Vacate should be granted. |
| February 14, 2014 | Supreme Court affirms Superior Court's judgment. |

As is evident from the chronology, Debtor's argument before the state courts that she did

not live at the Union Street Property at the time that the sheriff served the writ of *levari*

*facias*, focused on the time frame at and before November, 2011—a full six plus years before

Debtor filed her petition on December 7, 2017. This is verified by the Superior Court's

finding that Debtor lived at the 205 Ayre Street Property from 2007 until 2011.[53]

---

[52] Answering Brief, Ex. 5.
[53] Superior Court Ruling 6. The Superior Court further finds that Mikhail evicted Debtor in 2011 because she threatened to burn his house down and "a social worker found Debtor an alternative residence in a communal arrangement on West Street in Wilmington." *Id.* The Superior Court does not specify the duration of that arrangement.

Here, the question is whether the Union Street Property was Debtor's principal residence on the Petition Date, some six years after the time period addressed by the Superior Court in the Foreclosure Action. Defendant's estoppel theory based on her representations in filings with the Delaware Superior Court and Delaware Supreme Court, thus, fails. At most, the position taken by Debtor in the Foreclosure Action is *some* evidence that she did not always live at the Union Street Property and can be factored into whether Deutsche Bank has met its burden of proof on the Objection.

## II. Other Evidence Submitted by Deutsche Bank Does Not Establish that the Union Street Property is not Debtors' Principal Residence

Throughout Deutsche Bank's submission is an underlying theme that the Union Street Property is not habitable and so Ms. Goldfeder could not have been living at the Union Street Property on the Petition Date. Alternatively, Deutsche Bank insinuates that Mikhail's actions undercut the position that the Union Street Property is Debtor's principal residence.

With its Objection or its Opening Brief, Deutsche Bank submitted documentation in support of its position, as follows:

- The November 12, 2013 Superior Court decision supplying answers to questions upon remand from the Delaware Supreme Court in the Foreclosure Action.[54]

- A transcript of a December 7, 2017 hearing in the Foreclosure Action.[55]

- A printout of a docket sheet for the case styled *Nancy Goldfeder v. McCloskey and Mikhail*, CPU4-17-000010 filed December 21, 2016 by attorney Darrell J. Baker, which lists Ms. Goldfeder's address as the Ayre Street Property.[56]

---

[54] Opening Brief, Ex. A.
[55] Opening Brief, Ex. B.
[56] Opening Brief, Ex. C.

- A Delaware State Identification Card dated 12-29-2014 showing Ms. Goldfeder's address as the Ayre Street Residence.[57]

- A copy of Page 36 of 39 of a document titled City of Wilmington, Delaware Vacant Property List updated 1/12/2018 listing the Union Street Property with a Vacant Date of 12/18/2008.[58]

- A copy of a what appears to be a return on an *Alias Fi Fa* Levy on personal property dated 10/19/2017.[59]

- A transcript dated August 23, 2012 in the Foreclosure Action.[60]

- Copies of documents issued to/mailed to/or otherwise directed to Mikhail at the Union Street Property:

  - Delaware Driver License issued to the Guardian on August 9, 2016.[61]

  - Letter dated October 25, 2012 from UBS Financial Services, Inc. addressed to the Guardian at the Property.[62]

  - PNC bank statements for an account in Mikhai's name for the periods of 12/05/2015 to 01/07/2016, 4/7/2015 to 5/6/2015, 4/9/2014 to 5/6/2014 and 8/7/2014 to 9/5/2014.[63]

  - A Subpoena Duces Tecum from the Attorney General of the State of Delaware in the case of *State v. George* in September 2009.[64]

While Debtor did not file a motion *in limine* or otherwise seek to exclude this evidence, Deutsche Bank did not file a declaration in support of its Objection or authenticate any of the documents it submitted for consideration.

---

[57] Debtor's Initial Response, Ex. D-1A; *see also* Answering Brief 6 n.3.
[58] Objection, Ex. A.
[59] Objection, Ex. G.
[60] Opening Brief, Ex. H.
[61] Opening Brief, Ex. D.
[62] Opening Brief, Ex. E.
[63] Opening Brief, Ex. F.
[64] Opening Brief, Ex. G.

A review of the briefs show that Deutsche Bank is using much of this evidence affirmatively to support its estoppel argument, in an attempt to show that the Union Street Property is uninhabitable and therefore could not be Debtor's principal residence or that the Union Street Property is being used for some other, unspecified, purpose.

Four of the documents are close in time to the Petition Date and merit consideration. First, the Vacant Property List reflects the Union Street Property on a list dated 1/12/18, one month after the Petition Date. This page also lists the owner of the Union Street Property as Select Portfolio Servicing. The ownership listing is incorrect or, at best, outdated, which calls into question the accuracy of the remaining information on the Vacant Property List. At no point in time has Deutsche Bank suggested that Debtor was not the legal owner of the Union Street Property on the Petition Date.[65] So, while the Vacant Property List may be some evidence that the Union Street Property was vacant on 12/18/2008—nine years before the Petition Date—the inaccurate ownership information as of the printout date does not provide convincing evidence that the Union Street Property was vacant on 1/12/18, or the Petition Date.

Second, Deutsche Bank relies on the October 19, 2017 sheriff's return of an *alias fi fa* levy of Debtor's goods and chattel and lands and tenements at the Union Street Property. Deutsche Bank correctly states that the sheriff writes: "Deputy spoke with neighbor at 1608, she informed deputy that home is vacant @ 2 years."[66] But, Detusche Bank ignores the immediately previous sentence in which the sheriff writes: "**Defendant** [Ms. Goldfeder]

---

[65] Indeed, such a position would be wholly inconsistent with the Foreclosure Action and Deutsche Bank's actions to satisfy its judgment by a sheriff sale of the Union Street Property. And, in fact, Deutsche Bank conceded in its Motion in *Limine* that Debtor owns the Union Street Property. Motion in *Limine* at ¶ 19 ("There has never been any dispute as to whether Debtor is the owner of the Property; Deutsche Bank agrees that she is.").
[66] Objection, Ex. G.

**refused to grant access** to the property resulting in Nulla Bona as to G&C; thereafter L&T levied."[67]  In her response to the objection, Ms. Goldfeder asserts that she has had significant problems with one of her neighbors.[68]  In any event, the statement from the neighbor contradicts the sheriff's statement that Debtor refused him access to the Union Street Property so he was unable to levy on Debtor's goods and chattels.  If the Union Street Property were vacant, the sheriff could have (and presumably would have) simply noted that as the reason he was unable to levy on Debtor's goods and chattels.

Third, the Docket Sheet (presumably containing information supplied by attorney Darrell J. Baker) provides some evidence that the Union Street Property was not Debtor's principal residence one year prior to the Petition Date.

Fourth, Deutsche Bank submitted a transcript of a teleconference on an emergency motion to set aside a sheriff's sale before Judge Butler.  This hearing occurred on December 7, 2017—the Petition Date.  Deutsche Bank argues the transcript reflects that Judge Butler "presumed Debtor lived [at the Ayre Street Property] on the date she filed her petition."[69]

Deutsche Bank takes Judge Butler's statement out of context.  As reflected in the transcript, during the teleconference, Judge Butler had not seen Debtor and Deutsche Bank for at least a year (maybe two), and he poses questions regarding the condition of the Union

---

[67] *Id.*
[68] Ms. Goldfeder writes off the neighbor as a "nasty neighbor, who has repeatedly tormented Debtor [and] made misstatements." Debtor's Initial Response 3–4, 6.
[69] Opening Brief 5.

Street Property. The following colloquy took place between Judge Butler and Debtor's counsel:

> The Court:   So, let's say that this property goes to sheriff's sale. The last I heard it was in a state of serious disrepair. I doubt the guardian has done diddly squat to repair it. So, is it still the case that the place's in bad shape?
>
> Mr. Brown:   Your Honor, that is my understanding. My understanding is that Miss Goldfeder resides there. But due to the condition of the property, she actually spent a fair amount of time taking advantage of the amenities that guardians do to, you know, provide for her, and stuff.[70]

After that, the following colloquy took place between Judge Butler and Deutsche Bank's counsel:

> Ms. Rogin:   Your Honor, well, there's a couple things. I do not believe anyone does live in the house because every time the sheriff has tried to serve Mrs. Goldfeder or the guardian at the property, they've been told by neighbors that it's vacant and they can never find anyone there. So, you know, I'm not sure that the arguments that, you know, that she was being devastated by the sale of the house holds up.
>
> The Court:   She lives in the basement of Mikhail's house in Newport.
>
> Ms. Rogin:   Right, that's what I believe is true.[71]

Contrary to Deutsche Bank's contention that Judge Butler "presumed" Debtor lived at the Ayre Street Property, he appears to simply be recalling the previous status. Taken in context, Judge Butler is not making any statement about where Debtor lived on the Petition Date, and certainly, he is not making any finding. Moreover, as reflected in the transcript,

---

[70] Opening Brief, Ex. B. 11:19–12:6.
[71] *Id.* at 15:2–15:13.

Debtor's counsel states his understanding that Debtor was living at the Union Street Property on the Petition Date.

The remainder of the documents submitted by Deutsche Bank suggest that Mikhail was listing the Union Street Property as his address. While these documents perhaps raise some questions regarding Mikhail or his motivations (or, perhaps not), these documents do not support a conclusion that the Union Street Property is not Debtors' principal residence.[72]

Reviewed in its totality, the evidence submitted by Deutsche Bank does not persuade me, by a preponderance of the evidence, that the Union Street Property was not Debtor's principal residence on the Petition Date. Consistent with Deutsche Bank's estoppel argument, much of the evidence significantly pre-dates the Petition Date. The evidence on or close to the Petition Date contains statements that may support Deutsche Bank's position, but also support Debtor's claimed exemption. To the extent the evidence is contradictory, Deutsche Bank has not met its burden of proof.

### III.    Evidence submitted by Debtor

Assuming Debtor had a burden of production with respect to the Objection (*see supra* n. 23), she has met it. In addition to the Petition and Schedules[73] (which show the Union Street Property as her address), Debtor submitted documentary evidence in opposition to the Objection as follows:

- A Delaware Polling Place Card from the Department of Elections dated 3/20/2018 showing the Union Street Property as Debtor's residence.[74]

---

[72] Of course, to the extent that Mikhail was also living at the Union Street Property, that is not evidence that it is not Debtor's principal residence.

[73] Answering Brief, Exs. 1–4.

[74] Answering Brief, Ex. 8.

- Three Delaware state issued identification cards showing the Union Street Property as Debtor's residence (one date is not readable, the other dates are 02-26-2013, 08/20/2018).[75]

- Various mortgage statements (or segments thereof) from Select Portfolio Servicing mailed to Debtor at the Property with statement dates of 8/13/2015, 1/12/2016, 4/14/2016, 10/13/2016, 11/14/2016, 2/15/2017, 8/15/2017, 11/15/2017, 7/12/2018, 10/15/2018, 11/15/2018.[76]

- Various photos of the Property, both inside and out taken April 20, 2018 reflecting furnishings and personal items in the living space, bedroom, bathroom and kitchen.[77]

- The Certification of Stacey A. Mattia dated June 27, 2019 regarding a May 2, 2019 and May 8, 2019 visit to the Union Street Property to meet Ms. Goldfeder and to take pictures together with the pictures taken.  The pictures reflect furnishings and personal items in the living space, bedroom, bathroom and kitchen.[78]

- A Memorandum written by Stacey A. Mattia regarding her May 2, 2019 visit reflecting her discussion with Ms. Goldfeder.[79]

- Various Delmarva Power bills for the Union Street Property, including a statement for the period of 12/17/2017- 1/18/2018 with new electric charges of $151.99.[80]

- Quarterly Utility Statements from the City of Wilmington (water) showing usage for the periods of (i) 12/2/17 to 3/6/18, (ii) 3/6/18 to 6/1/18 and (iii) 8/22/18-9/18/18.[81]

- Various printouts from Walgreens dated 12/5/17 through 8/7/18 listing Debtor and the Union Street Property address.[82]

- Statements from M&T bank addressed to Ms. Goldfeder at the Union Street Property for the period of 3/31/18-4/30/18, 5/1/18-5/30/18, 5/31/18-6/29/18, 6/30/18-7/30/18, 5/1/19-5/30/19).[83]

---

[75] Answering Brief, Ex. 8.

[76] Answering Brief, Exs. 9, 10.

[77] Answering Brief, Ex. 11.

[78] Answering Brief, Ex. 12.

[79] *Id.*

[80] Answering Brief, Ex. 19.

[81] *Id.*

[82] *Id.*

[83] *Id.*

- The transcript of the Section 341 meeting held April 9, 2018 at which the Guardian testified that Debtor lives at the Union Street Property, but that she goes to the Guardian's house for taking showers and food. He further testified that Debtor is "emotionally attached to the house and she want to go every day."[84]

As stated above, Deutsche Bank objects to much of this evidence. In particular, Deutsche Bank asserts authentication and foundation objections to the photographs of the Union Street Property, and the Delaware state identification cards. Deutsche Bank adds hearsay objections to the bank and utility statements. And, Deutsche Bank adds "failure to produce" in discovery as grounds to preclude the section 341 meeting transcript and the National Title Insurance Company record.

    *(i)    Authentication/Foundation*

In the Third Circuit, the standard for authenticating evidence is "slight."[85] Only a *prima facie* showing is necessary, and once made, it is for the fact finder to ultimately determine the authenticity of the evidence. Federal Rule of Evidence 901 provides examples of appropriate methods of authentication, such as "reliance on appearance, contents, substance, internal patterns of other distinctive characteristics of the item."[86] But, this list is not exhaustive and circumstantial evidence can suffice to show authenticity.[87]

I conclude that the Delaware Polling Place Card, state issued identification cards, mortgage statements, Delmarva Power bills, quarterly utility statements from the City of Wilmington, and the bank statements from M&T meet the slight burden to show authenticity, and as the fact finder, I find them authentic. The appearance of these

---

[84] Answering Brief, Ex. 7.
[85] *United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013) (citing *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985)).
[86] Fed. R. Evid 901(b)(4).
[87] *Turner*, 718 F.3d at 232.

documents appear as they should, and contain the information such documents would typically have.[88] And, the documents were produced by Debtor during discovery.[89] Further, while it is Debtor's burden to prove authentication, Deutsche Bank has not suggested any credible reason to doubt authenticity.[90]

I also conclude that I can consider these documents under Federal Rule of Evidence 807, the residual hearsay exception. While I recognize the rule is to be used rarely, these documents have "exceptional guarantees of trustworthiness" because Debtor, banks and others rely on them to show evidence of residency.[91] I also note that the mortgage

---

[88] *Turner*, 718 F.3d at 233.

[89] *Id.* at 232 ("considering that documents were produced in response to a discovery request as evidence of authenticity") (citing *McQueeney*, 779 F.2d at 929). In its Interrogatories, Deutsche Bank asked the following questions:

> 6.    Do you pay for any utilities, including but not limited to gas, oil, electric, or water for the Property? If you answer is in the affirmative, identify and describe what utilities you pay with respect to the Property, and attached a copy of the most recent bill to these interrogatories.
>
> 7.    Please provide a copy of all heating, electric, water, cable, internet, phone and oil bills for the Property from November 1, 2017 to the present.
>
> 13.    Do you have an account with any bank? If your answer is in the affirmative, identify and describe the account, and attached a copy of the most recent statement to these interrogatories.
>
> 14.    Do you have any form of state or government issued identification card? If your answer is in the affirmative, identify the source of identification, and attach a copy of each such identification card to these interrogatories.

Exs. A through J (Corrected) in Supp. of Mot. to Compel Disc. Responses, Ex. A (Deutsche Bank National Trust Company's Interrogatories and Requests for Production Directed to Debtor) ("Deutsche Bank's Discovery Requests"), D.I. 48.

[90] *Turner*, 718 F.3d at 233.

[91] *See, e.g.*, 2217 Driver License and Identification Card Application Procedures for Delaware Compliant and Delaware Non-Compliant Identification Documents:

> 8.0    Principal Residence Address.
>
> 8.1    The division and Delaware State Police must be able to contact every identification document holder at the physical location where he lives in this State. Therefore, every applicant must provide two documents that show the individual's name and principal Delaware residence using such documents as utility bills, auto or life insurance policies, W-2 or filed tax forms, voter registration card, bank account records, credit card statements, employment records, signed contract to purchase home in this State, rental agreement or any other document specifically approved by the Chief of Driver Services or Director. These source documents will be electronically stored and when possible, verified. The applicant should notify the

statements are from Select Portfolio Servicing, Deutsche Bank's agent and/or predecessor. Further, Deutsche Bank is capable of verifying such documents through discovery requests to third parties and so was in a position to debunk these documents if they were in error or falsified in any way.[92]

The photographs of the Union Street Property, Ms. Mattia's certification and memorandum, however, are not the type of information that Deutsche Bank was in a position to independently validate. The photographs show both the outside and inside of the Union Street Property as of two points in time: April, 2018 ("Initial Photographs") and May, 2019. The photographs reflect furnishings and personal belongings in the living spaces, or, in other words, a house that is lived in.

Debtor points out the photographs were produced in direct response to Deutsche Bank's interrogatories and document requests. On March 27, 2018, Deutsche Bank propounded the following document requests:

> 3.    Produce pictures of the Property which show its current physical condition.
>
> 4.    For each and every room within the Property, produce pictures of the Property which show its current interior physical condition.[93]

---

division within 30 days after he changes his address. No proof is needed to change a person's address, and it can be accomplished by mail. A Delaware compliant driver license or identification card will not be issued to an applicant unless the applicant has established a principal residence address in this State at the time of application. 2 Del. Admin. Code. §§ 2217-8.0–8.1.

[92] The rules of evidence are to be construed to administer justice. Fed. R. Evid. 102 ("These rules should be construed so as to administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination"). Accepting this evidence furthers this purpose. And, as already stated, Deutsche Bank did not submit declarations attesting to authenticity and submitted documents that were clearly hearsay. Under these circumstances, it is fair to consider documents with intrinsic guarantees of trustworthiness.

[93] Deutsche Bank's Discovery Requests.

In August, 2018, Deutsche Bank acknowledged receipt of the Initial Photographs taken in April 2018 and as a follow-up asked Debtor to "[p]lease confirm that the pictures produced reflect each and every room within the Property."[94]  Debtor further explains that because Mikhail was not available for a deposition, Debtor's counsel sent her paralegal, Ms. Mattia, to retake photographs of the Union Street Property to, in essence, recreate the photographs taken in April 2018.  Ms. Mattia was also offered up for a deposition at the May 30, 2019 hearing.

While I believe these photographs to be authentic, these are not the types of documents that lend themselves to the authentication and admission analysis in *Turner*. Further, Mikhail did not submit to a deposition and so Deutsche Bank did not have an opportunity to explore the genesis of the photographs or his testimony at the section 341 meeting.  Deutsche Bank's Motion *in Limine* and/or Motion for Sanctions is granted as to the photographs and Ms. Mattia's certification and I will not consider them.[95]

But, even without the photographs and other excluded evidence, the admitted evidence is more than enough to meet the evidence submitted by Deutsche Bank in support of the Objection.  The Delaware Polling Place Card, state issued identification cards, mortgage statements, Delmarva Power bills, quarterly utility statements from the City of Wilmington (subject to the caveat below) and M&T bank statements all evidence that Debtor was living at the Union Street Property on the Petition Date.  While Deutsche Bank questions this and makes sweeping conclusions because of Debtor's admitted inability to live in the Union Street Property for long periods of time, Debtor's evidence is sufficient to

---

[94] Exs. A through J (Corrected) in Supp. of Mot. to Compel Disc. Responses, Ex. J (August 17, 2018 Letter from Alexandra D. Rogin, Esquire to Erin K. Brignola, Esquire).

[95] Neither will I consider what appears to be a one page handwritten title search of the Union Street Property.

meet Deutsche Bank's evidence and suppositions.  Simply put, to the extent that Debtor has

a burden of production, Debtor's evidence is sufficient to bring the burden of persuasion—

which falls on Deutsche Bank— into play.

### IV.    Deutsche Bank Fails to Meaningfully Impeach Debtor

In its Reply Brief, Deutsche Bank proffers, in a footnote, that it seeks to use

"photographs and documents produced by Debtor" for impeachment purposes.[96]  Deutsche

Bank does not articulate specific documents or an impeachment purpose for each document

(e.g., contradictory facts, prior inconsistent statement, bias, etc.).  Nonetheless, Deutsche

Bank raises what it terms inconsistencies that discredit Debtor's testimony.

First, Deutsche Bank correctly states that Debtor produced a Delaware issued

identification card that lists her address as the Ayre Street Property.[97]  This identification

card was issued in December of 2014.[98]  Thus, at the most, the identification card listing the

address of the Ayre Street Property is some evidence that Debtor, years ago, purported to

live at the Ayre Street Property.  It does not, however, establish that Debtor did not live at

the Union Street Property as of the Petition Date.  While there is certainly an inconsistency

among the various Delaware identification cards Debtor produced, I do not find that this

discrepancy sufficiently impeaches Debtor's credibility.

---

[96]  The full footnote reads: "Creditor reasserts its objection to the introduction of any photographs and documents produced by Debtor for use as substantive evidence by Debtor, and instead relies upon the documents solely for impeachment purposes." Reply Brief 5 n.9.

[97]  Opening Brief 4–5 ("Post-petition, Debtor has produced only inconsistent, non-credible, or contradictory evidence to support her claims. For example, in response to Creditor's Objection, Debtor actually produced an identification card listing her address as that of her Guardian's: the East Ayre Street Address."). The identification card was attached to Debtor's response to Deutsche Bank's objection as Exhibit D-1A.  Debtor's Initial Response, Ex. D-1A.

[98]  Debtor's Initial Response, Ex. D-1A; Answering Brief 6 n.3.

Second, Deutsche Bank takes issue with the fact that Debtor alleged in her Schedules and stated in response to an interrogatory that there was no running water at the Union Street Property but now has produced utility bills reflecting water usage.[99] As for the Schedules,[100] the objection[101] and the interrogatory responses,[102] they reflect different points in time: December 7, 2017 (no running water), March 16, 2018 (no running water) and April 10, 2018 (running water).  There is not necessarily, therefore, any inconsistency in these responses.  The water bill and/or its history is a little hard to decipher and Deutsche Bank does not provide me the benefit of its thinking or why the water bill/history calls Debtor's credibility into question, generally.  But, given what appear to be many identical quarterly charges, the bill could reflect a minimum charge, and is therefore of little assistance.[103]

Third, Deutsche Bank points to a contradiction contained in Debtor's schedules.[104] On Schedule A/B, in response to the question "Do you own or have any legal or equitable interest in [Electronics]," Debtor checked the box "No."[105]  However, on Schedule J, Debtor

---

[99] Reply Brief 4–5.

[100] Petition.

[101] Debtor's Initial Response 7.

[102] Exs. A through J (Corrected) in Supp. of Mot. to Compel Disc. Responses, Ex. B at 1 (April 10, 2018 email from Mikhail to Stacey Mattia),

[103] In a one sentence footnote, Deutsche Bank also contends the electric bills impeach Debtor's credibility "as although barely legible the statements show higher usage in 2016 when she was allegedly not living at the Property than in 2017 when the Petition was filed."  Reply Brief 5.  I cannot discern anything of relevance for impeachment purposes from the electric bill nor does Deutsche Bank point me to any specific statement made by Debtor it is seeking to impeach.  But, as stated *supra*, the electric bills do show current charges for the period of September 13, 2017 to October 10, 2017 and for December 17, 2017 to January 2018.  This evidence tends to corroborate that Debtor was living at the Union Street Property on the Petition Date.

[104] *Id.* ("Similarly, Debtor alleges in one Schedule before this Court related to her assets that she has no electronics . . . and she contradictorily admits to having a cell phone and internet access.").

[105] Answering Brief, Ex. 4.

purports to have expenses for "Cell Phone" and "Internet Access."[106] These responses are internally, but openly, contradictory. This discrepancy carries little, if any, weight.[107]

Finally, I have considered Deutsche Bank's inability to depose either Debtor or Mikhail. This is less than ideal. But, because of this, I have excluded certain evidence as requested in the Motion *in Limine* and the Motion for Sanctions. I observe that Deutsche Bank was not precluded from deposing Debtor's neighbors or issuing subpoenas to third party custodians of relevant documents. Deutsche Bank chose not to go this route. It also chose to submit this dispute on paper rather than forcing a trial.

### *Conclusion*

After considering the evidence submitted, I find that Deutsche Bank has not satisfied its burden of proof to show that the claimed homestead exemption is not properly claimed. Its main argument—that Debtor is estopped from arguing she lives at the Union Street Property—is not well taken. Debtor's argument before the Delaware State Courts that she was not properly served with process in November, 2011 because she did not then live at the Union Street Property is not inconsistent with her position that the Union Street Property was her principal residence on the Petition Date. Neither the Delaware Superior Court nor the Delaware Supreme Court made any finding with respect to where Debtor lived on the

---

[106] Answering Brief, Ex. 5.

[107] Further, Deutsche Bank alleges that certain photographs Debtor sought to introduce into evidence show a TV, printer, microwave and kitchen appliances. The photographs showing the TV and printer were taken on May 2, 2019, over a year and a half after the Petition Date. These later photographs were taken in an attempt to reproduce photographs taken by Mikhail on or about April 17, 2018 in an effort to overcome Deutsche Bank's objections. Answering Brief, Exs. 11, 12. Moreover, the microwave and kitchen appliances constitute "Household goods and furnishings," not electronics, for purposes of Schedule A/B. Debtor properly acknowledged ownership of the microwave and kitchen appliances on Schedule A/B, by checking the "Yes" box next to Household goods and furnishings and and further stating she had "3 Rooms Used Household Goods" Answering Brief, Ex. 3.

Petition Date as that question was not an issue in the Foreclosure Action.  Further, Deutsche Bank's argument that Debtor's evidence is inconsistent, non-credible or contradictory does not win the day even excluding evidence in response to Deutsche Bank's Motion *in Limine* and Motion for Sanctions.  Deutsche Bank, not Debtor, has the burden of proof.

Deutsche Bank's frustration at spending years obtaining a judgment only to have Debtor file bankruptcy to avoid execution is understandable,[108] and perhaps explains why it has continued to pursue the Union Street Property, worth less than $125,000, for over ten years.  But, it is quite common for a debtor to file a bankruptcy proceeding only after a judgment is obtained in order to avoid execution.  And, in this instance, Deutsche Bank simply did not meet its burden to show that Debtor's homestead exemption is not properly claimed.

An order will enter consistent with this Opinion.

Dated: October 26, 2020

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

---

[108] Reply Brief 8–9.  *See also* Opening Brief 4 n.1 ("Debtor has essentially taken the Property that she now claims as exempt from creditors without making any substantial payment towards the Property.").